FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 AUG 31 PM 12:03

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JOHN E. DELL and PRIME PLUS  \*
ACQUISITION CORP., a Florida corporation  \*
\*
\*
v.  \*  Civil No. JFM-16-00887
\*
\*
RICHARD A. DETAR and MILES &  \*
STOCKBRIDGE, P.C., a Maryland  \*
Professional corporation  \*
\*\*\*\*\*\*\*\*

## MEMORANDUM

Plaintiffs John E. Dell ("Dell") and Prime Plus Acquisition Corp. ("PPAC") bring this lawsuit against defendants Richard A. DeTar ("DeTar") and Miles & Stockbridge, P.C. ("M&S") alleging legal malpractice, breach of fiduciary duty, gross negligence, and vicarious liability of M&S in connection with defendants' legal representation of plaintiffs following the discovery of financial fraud by an asset-based lending company in which PPAC had invested. Now pending is defendants' motion for judgment on the pleadings and partial summary judgment. (ECF No. 65). The motions are fully briefed and no oral argument is necessary. *See* Local R. 105.6. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

This dispute arises out of DeTar and M&S's allegedly deficient legal representation of Dell and Prime Plus following the discovery and subsequent prosecution of financial fraud on the part of John Murphy ("Murphy"), the sole manager of an asset-based lending company that had received substantial investments from PPAC and its lenders. (ECF No. 7). Plaintiff Dell is the Vice President of Florida Corporation PPAC. (*Id.* ¶¶ 1, 2). Defendant DeTar has represented PPAC and Dell, individually, on various matters since Dell and DeTar met in 2000. (*Id.* ¶ 32;

ECF. No. 74, Ex. A, ¶¶ 6–8). Eventually, DeTar would become Dell's primary personal attorney as well as the primary attorney for PPAC. (ECF No. 7 ¶ 33). Though Dell and PPAC are located in the state of Florida, law firm M&S, at which DeTar is a Principal and employee, has its principal place of business in Baltimore, Maryland. (*Id.* ¶ 3–4). Detar is licensed to practice law in the state of Maryland, but plaintiffs maintain he frequently traveled to Florida to provide legal advice to plaintiffs. (*Id.* ¶ 3; ECF No. 74, Ex. A, ¶¶ 9–12).

In 2001, PPAC, along with the Israeli Discount Bank of New York ("IDB") and an individual named John Murphy ("Murphy"), provided investments and loans to form Oak Rock Financial, LLC, ("Oak Rock"). (ECF No. 7 ¶ 24). Oak Rock was an asset-based lending company that financed installment contracts for the purchase of consumer goods by various dealers. (*Id.* ¶23).[1] Oak Rock's primary source of funds was a syndicate of banks formed by IDB, though it received investments and loans from a variety of other sources. (*Id.* ¶ 29–30). As a condition of providing the bulk of Oak Rock's financing, IDB mandated that Oak Rock be exclusively managed by Murphy. (*Id.* ¶ 27).

Following the financial crisis in 2008, Oak Rock began exploring new corporate governance and restructuring options. (*Id.* ¶ 35). In 2009, Oasis Oak Rock Investors, LLC ("Oasis) was formed to invest in Oak Rock's Senior Preferred Units and Class B Common Units. (*Id.* ¶ 36). As part of Oak Rock's restructuring effort, PPAC exchanged ten million dollars of its secured Oak Rock debt for preferred membership interests in Oak Rock that were ultimately subordinate to all loans to Oak Rock as well as Oasis' investments. (*Id.* ¶ 39). In 2010, DeTar introduced Dell to Aubrey Gladstone ("Gladstone"), president of Gladstone Consulting, Inc.

---

[1] Oak Rock obtained the funds for its loans to commercial goods dealers through low interest rate loans from commercial banks and higher interest rate financing from private investors. (ECF No. 7 ¶ 23).

("GCI") and managing member and sole owner of EPIX Litigation Funding, LLC ("EPIX"). (*Id.* ¶¶ 41, 43). Shortly after Gladstone and Dell were introduced, EPIX invested $1.3 million in membership interests of Oasis, and Gladstone and his wife loaned PPAC $500,000 which was then loaned to Oak Rock. (*Id.* ¶¶ 43, 45). GCI became the record owner of EPIX's investment in Oasis in 2012. (*Id.* ¶ 46).

As Oak Rock began to attract more investors following its restructuring efforts, Dell, PPAC, and the management at Oasis decided that broadening Oak Rock's management team and making improvements to its computerized systems would help boost Oak Rock's institutional image. (*Id.* ¶ 48–49). DeTar performed a number of legal services for PPAC over the course of Oak Rock's restructuring efforts including, but not limited to, reviewing Murphy's employment contract, the provisions of Oak Rock's Operating Agreement, and various loan documents. (*Id.* ¶ 50). During the process of updating Oak Rock's computer systems, Oasis' manager and a computer scientist uncovered discrepancies in Oak Rock's financial records. (*Id.* ¶ 53). Murphy subsequently admitted he had been committing fraud and misrepresenting the state of Oak Rock's receivables. (*Id.* ¶ 54). Murphy's fraud and subsequent criminal prosecution put Oak Rock's creditors and investors at risk of losing a substantial amount of money. (*See id.* ¶ 58). Because PPAC's $15,000,000 financial stake in Oak Rock was subordinate to that of Oak Rock's other investors, PPAC was the least likely to share in any recovery and was at risk of defaulting on its own financial obligations. (*Id.*).

DeTar recommended that Dell and PPAC retain his firm, M&S, as well as Gladstone's consulting company, GCI, to help plaintiffs navigate the ensuing crisis. (*Id.* ¶ 65). Furthermore, DeTar advised Dell, PPAC, Oasis, and Oasis's manager to retain himself, M&S, and GCI on behalf of Oak Rock. (*Id.* ¶¶ 68, 70). According to Dell, because GCI had invested in Oasis and

Gladstone had personally loaned Dell $500,000 that was eventually invested through PPAC in Oak Rock, retaining GCI to represent Dell, PPAC, and Oak Rock was contingent on Gladstone, GCI, and EPIX agreeing not to pursue any action against plaintiffs or advance their interests over those of other investors during the process. (*Id.* ¶ 73). After receiving assurances that DeTar would secure subordination agreements from Gladstone and GCI, Oak Rock executed a consulting agreement with GCI. (*Id.* ¶ 76).[2] Plaintiffs were aware when they retained GCI that there were no formal subordination agreements in place, but they maintain that they relied on DeTar's assurances that the agreements and necessary waivers would be timely executed. (*Id.* ¶ 66). DeTar never obtained subordination agreements from the Gladstones or GCI. (*Id.* ¶ 81).

Gladstone and his wife filed a lawsuit against PPAC in Florida state court on May 13, 2013, seeking repayment of their $500,000 note. (*Id.* ¶ 84).[3] On February 18, 2014, GCI filed a lawsuit against PPAC, Dell, Oasis Capital Management, LLC,[4] and Thomas Stephens ("Stephens")[5] in Florida state court, relating to EPIX's $1,300,000 investment in Oasis. (*Id.* ¶ 85).[6] Additionally, on June 20, 2014, Gladstone filed a lawsuit in Florida state court against Dell relating to the aforementioned $500,000 note. (*Id.* ¶ 86). IDB and the group of syndicate banks formed to generate loans to Oak Rock filed a petition for involuntary bankruptcy against Oak Rock on April 29, 2013. (*Id.* ¶ 99). The involuntary bankruptcy petition cited conduct on the

---

[2] DeTar instructed Thomas Stephens ("Stephens"), who was then serving, at the advice of DeTar, as the interim "leader" of Oak Rock, to transfer $250,000 to M&S and $75,000 to GCI as their respective retainers. (ECF No. 7 ¶ 92, 94). Stephens transferred the $250,000 to M&S and the $75,000 to GCI out of Oak Rock's funds as instructed. (*Id.* ¶ 93, 95).
[3] *Marianne Gladstone, et al. v. Prime Plus Acquisition Corp.*, 15th Circuit Case No. 502013CA008751XXXXMB.
[4] Oasis Capital Management, LLC managed Oasis Oak Rock Investors, LLC ("Oasis").
[5] Stephens was the principal of Oasis Capital Management, LLC and the manager of Oasis.
[6] *Gladstone Consulting, Inc. v. Prime Plus Acquisition Corp., et al.*, 15th Circuit Case No. 502014CA001988XXXXMB.

part of Oak Rock that plaintiffs contend was undertaken as a direct result of advice they received from M&S attorneys. (*Id.* ¶ 101).[7]

Plaintiffs filed a complaint in the Southern District of Florida December 30, 2015, alleging DeTar committed legal malpractice, breach of fiduciary duty, and gross negligence, and that M&S is vicariously liable for DeTar's actions. (ECF No. 1). An amended complaint was filed on January 28, 2016, (ECF No. 7), and defendants moved to dismiss the amended complaint on February 17, (ECF No. 14). Judge Donald M. Middlebrooks granted in part defendants' motion to dismiss on the grounds that venue in the Southern District of Florida was improper on March 23, 2016, and transferred the case to the District of Maryland. (ECF No. 30). On March 29, 2017, defendants filed a motion for judgment on the pleadings and partial summary judgment. (ECF No. 65). The amended complaint alleges four counts: legal malpractice (Count I); breach of fiduciary duty (Count II); gross negligence (Count III): and vicarious liability of M&S (Count IV).

## STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is evaluated under the same standards as a motion to dismiss under Rule 12(b)(6). *See Bruce v. Riddle*, 631 F.2d 272, 273–74 (4th Cir. 1980). In reviewing a motion to dismiss for failure to state a claim, the court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435,

---

[7] Neither plaintiffs nor DeTar enlisted the help of bankruptcy counsel to negotiate with the syndicate banks prior to the involuntary bankruptcy filing. (ECF No. 7 ¶ 98). Instead, DeTar met with the syndicate banks directly. (*Id.*).

440 (4th Cir. 2011). The complaint must allege facts sufficient to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). The court is not, however, required to accept the legal conclusions derived from the facts, and "[a] complaint that provides no more than labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient to meet the pleading standard. *Twombly*, 550 U.S. at 555; *see also Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (stating that the "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)").

Rule 56(a) of the Federal Rules of Civil Procedure provides the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* When reviewing a motion for summary judgment, the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

It is not the role of the judge on summary judgment "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477

U.S. at 249. The court may not, for example, make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Furthermore, in the face of competing evidence, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

## ANALYSIS

Plaintiffs assert four claims against the defendants: legal malpractice against DeTar (Count I), breach of fiduciary duty against DeTar (Count II), gross negligence (Count III), and vicarious liability of M&S (Count IV). In response, defendants argue that Dell and PPAC were contributorily negligent, plaintiffs assumed the risk of injury, plaintiffs have failed allege facts supporting a gross negligence claim, and, finally, that Count II and Count IV are not cognizable causes of action under Maryland law.

### I. Choice of Law

As a threshold matter, the parties disagree about the state substantive law applicable to this action. Plaintiffs maintain that, because the legal advice dispensed by DeTar and M&S caused harm to Dell and PPAC in the state of Florida, Florida substantive law applies to plaintiffs' claims. (*See* ECF No. 74-1, p. 16). Defendants, however, insist that Maryland substantive law governs plaintiffs' claims, because the allegedly defective legal advice as well as "[a]ll of the acts or omissions alleged . . . undisputedly occurred in Maryland." (ECF No. 65-1, p. 19).

In a diversity action, the United States District court sitting in Maryland applies Maryland's choice of law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 31 U.S. 487 (1941); *Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*, 132 F.3d 1017, 1037 (4th Cir. 1997). For causes of action based in tort, Maryland follows the *lex loci delicti* rule. *See Phillip Morris Inc. v. Angeletti*, 752 A.2d 200, 231 (Md. 2000). *Lex loci delicti* mandates that a tort action be governed by the substantive law of the state in which the wrong occurred. *Id.* In general, "the place of the tort is considered to be the place of the injury," *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F.Supp.2d 604, 608 (D. Md. 2008), or, stated differently, the place in which the last act required to complete the tort occurred, *see Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510–11 (4th Cir. 1986). Maryland courts have not, however, squarely addressed the proper application of *lex loci delicti* in cases where the wrongful conduct in one jurisdiction causes pecuniary loss or injury to the plaintiff in another jurisdiction. *See, e.g., Sinclair Broad. Grp., Inc. v. Colour Basis, LLC*, 2016 WL 3541204, at *7 n.8 (D. Md. June 29, 2016); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 735 (D. Md. March 18, 2005);[8] *Cremi v. Brown*, 955 F. Supp. 499, 523 (D. Md.), *aff'd, Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997). Though the case law is somewhat inconsistent, it appears that courts determine which state's substantive law should apply in cases of multi-state pecuniary loss according to the particular factual circumstances of each case, and may in some cases apply the law of the state in which the wrongful conduct itself occurred. *See, e.g., Cremi*, 132 F. Supp at 522–24.

---

[8] In *Bancroft Commercial, Inc. v. Goroff*, 2014 WL 7409489, at *4 n.5 (D. Md. Dec. 31, 2014), the district court noted that while the question of which state law applies when the defendant's wrongful act and the plaintiff's injury occur in different jurisdictions was certified to the Court of Appeals of Maryland in *Hardwire*, the certification was withdrawn as moot when the parties reached a settlement.

Relatedly, Maryland recognizes a narrow exception to the application of the *lec loci delicti* doctrine for cases involving the application of a specific standard of care. *See Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 846–47 (Md. 2006). The *lex loci delicti* carve-out, referred to as the "common sense" or the "standard of care exception," dictates that the law of the state in which the wrongful *conduct* occurred, rather than the law of the state where the ultimate injury was suffered, should apply when the defendant's conduct is regulated by a particular standard of care. *See, e.g., Farewell v. Un*, 902 F.2d 282, 287 (4th Cir. 1990).[9] The "standard of care exception" appears to be rooted, at least in part, in the notion that states have a strong interest in regulating the conduct of professionals practicing within their jurisdiction. *See generally id.* For example, in cases involving claims of medical malpractice, courts will generally apply the law of the state in which the deficient medical care was provided, even if the injury or medical complication subsequently arose in another jurisdiction. *See, e.g., id.*; *Hood*, 911 A.2d at 846.

The logic of the "standard of care" exception for medical malpractice claims in the Fourth Circuit has been extended, in at least one instance, to claims for legal malpractice. *See McCoubrey v. Kellogg, Krebs & Moran*, 7 F. App'x 215, 219 (4th Cir. 2001). In *McCoubrey*, the Fourth Circuit elected to apply Virginia law to plaintiff's legal malpractice claim, despite the fact that the plaintiff, a resident of Maryland, was allegedly "damaged" in the state of Maryland.

---

[9] Cases dealing with the "common sense" exception reference the First Restatement, which provides:

> "Where by the law of the place of the wrong, the liability-creating character of the actor's conduct depends on the application of a standard of care, and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct, such application of the standard will be made by the forum."

Restatement of Conflict of Laws § 380(2) (1934).

*See id.* In holding that Virginia law applied, the court noted that the wrongful "act" complained of by the plaintiff - the filing of a deficient responsive pleading - occurred in Virginia, and that the defendant attorneys were all members of the Virginia bar and had offices located in Virginia. *See id.* at 219–20. Though the question of whether an attorney breached the relevant standard of care will depend on the context and factual circumstances of the case and will often, though not always, require the submission of expert testimony to establish the professional baseline, *see Fishow v. Simpson*, 462, A.2d 540 (Md. App. 1983), both the case law and logic indicate that an attorney should be evaluated by the professional standard of care in the jurisdiction where he or she practices law.[10]

Plaintiffs contend that because defendants' conduct was not directed to parties in Maryland and the legal advice DeTar and M&S gave to Dell and PPAC caused damage to plaintiff in the state of Florida, Florida law should apply to plaintiffs' claims. (ECF No. 74-1, p. 16). Defendants counter that "the alleged acts or omissions were by a Maryland lawyer practicing law entirely in the state of Maryland." (ECF No. 65-1, p. 23). Though plaintiffs are correct that the locus of the damage is in Florida, all of the legal advice complained of, as well as the conduct undertaken to execute that advice, occurred in the state of Maryland. As the court in the Southern District of Florida pointed out in their order transferring venue to the District of Maryland, "Plaintiffs have not established that a substantial part of the alleged events or omissions occurred in the Southern District of Florida," and, in fact, "Plaintiffs do not dispute

---

[10] Plaintiffs argue that, unlike in many of the medical malpractice cases cited by the defendants, there is no codified "standard of care" for attorneys in the state of Maryland. (ECF No. 74-1, p. 20). While it may be the case that there is no singular or neatly distilled standard of care that applies uniformly to legal malpractice actions, the applicable standard of care in each individual case must be established in order to determine whether a defendant was negligent. The plaintiff must, for example, demonstrate that the attorney neglected a reasonable duty in order to maintain a tort action for legal malpractice. *Flaherty v. Weinberg*, 492 A.2d 618, 627 (Md. 1985).

Defendants' contention that *all* of the relevant events giving rise to the conduct occurred outside this District." (ECF No. 30, p. 6).[11] M&S is a Maryland professional corporation of attorneys with its principal place of business in Baltimore Maryland, and DeTar is an attorney licensed to practice in the state of Maryland. (ECF No. 7 ¶¶ 3–4). Though DeTar was dispensing legal advice to Dell, a resident of Florida, and PPAC, a Florida corporation, and plaintiffs were sued by Gladstone and GCI in Florida, the majority of conduct plaintiffs' complain of was undertaken by DeTar in Maryland while he was practicing law with the authorization of this state's Bar. Given that the practice of law is heavily regulated in the state of Maryland, and the state undoubtedly has a strong interest in policing the actions of attorneys barred in the state, I believe that the "common sense approach" dictates applying Maryland substantive law to plaintiffs' tort claims alleging deficient legal representation.

## II. Count I: legal malpractice

Dell and PPAC allege that Detar and M&S committed legal malpractice by, among other things, failing to secure subordination agreements or executed waivers from Gladstone, his wife, and GCI, mishandling the bankruptcy proceedings, directing plaintiffs to retain GCI and pay retainers out of Oak Rock's account, and allowing Gladstone access to Oak Rock's private financial data that he would later use to boost his own litigation position. (ECF No. 7 ¶¶ 105–20). In their motion for summary judgment, defendants do not argue that plaintiffs have failed to establish the elements of a claim for legal malpractice.[12] Instead, defendants assert that Dell and

---

[11] Plaintiffs are correct that the Florida district court "made no findings as to the appropriate substantive law to be applied to this case," (ECF No. 74-1, p. 17), and the inquiry with respect to proper venue is distinct from the inquiry with respect to choice of law. The courts observations, however, regarding the locus of the defendants' conduct is nonetheless instructive.

[12] Defendants do deny the allegations of legal malpractice in their answer, and they make clear that they do not believe plaintiffs have stated a viable claim or that plaintiffs are entitled to any relief. (*See* ECF No. 33 ¶ 106).

PPAC were contributorily negligent and assumed the risk of defendants' actions when they hired GCI and Gladstone knowing that DeTar and M&S had not yet secured executed waivers or subordination agreements from either GCI or Gladstone. (ECF No. 65-1, p. 24).

Under Maryland law, "a plaintiff is contributorily negligent when he fails to exercise ordinary and reasonable care for his own protection," *Shofer v. Stuart Hack Co.*, 723 A.2d 481, 489 (Md. App. 1999), and contributory negligence is a "complete bar to recovery for a defendant's negligence," *Harrison v. Montgomery Cnty. Bd. of Educ.*, 456 A.2d 894, 895 (Md. 1983).[13] In determining whether a plaintiff was contributorily negligent, the court must ask "whether the plaintiff failed to exercise ordinary care, determined by what a reasonable person in the plaintiff's position would do under similar circumstances." *Shofer*, 723 A.2d at 489 n. 3. In the context of professional negligence, Maryland courts have held that while certain professionals are employed to protect clients against various risks, clients are not absolved from the responsibility to take reasonable precautions to protect their interests and do not retain an unqualified right to rely blindly on professional advice. *See Wegad v. Howard St. Jewelers, Inc.*, 605 A.2d 123, 127–28 (Md. 1992). While contributory negligence may, in very narrow circumstances, be decided as a matter of law, *see Catler v. Arent Fox, LLP*, 71 A.3d 155, 180 (Md. 2013), it is generally a question reserved for a jury, *see Campbell v. Baltimore Gas & Elec. Co.*, 619 A.2d 213, 216 (Md. App. 1993). In assessing whether a plaintiff was contributorily negligent on a motion for summary judgment, the court must construe all of the evidence in the light most favorable to the plaintiff, *see id.*, and "[t]he issue . . . cannot be taken from the jury

---

[13] Plaintiffs correctly note that comparative fault is not an affirmative defense to an attorney malpractice action under Florida law. (ECF No. 74-1, p. 23 n. 18 (citing *Tarleton v. Arsnstein & Lehr*, 719 So. 2d 325, 331 (Fla. Dist. Ct. App. 1998). Since I have concluded that Maryland law applies to this action, *see Section I, supra*, this argument is moot.

unless no reasonable person could reach a contrary conclusion," *May v. Giant Food, Inc.*, 712 A.2d 166, 175 (Md. App. 1998).

In order to establish a successful assumption of the risk defense, DeTar and M&S must demonstrate that plaintiffs "1) had knowledge of the risk of danger; 2) appreciated the risk; and 3) voluntarily exposed [themselves] to that risk." *Crews v. Hollenbach*, 751 A.2d 481, 489–90 (Md. 2000). As the Maryland Court of Appeals has explained, "the defense rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk." *Rogers v. Frush*, 262 A.2d 549, 554 (Md. 1970). Assumption of the risk is a complete bar to a plaintiff's recovery under Maryland law. *See ADM Partnership v. Martin*, 702 A.2d 730, 734 (Md. 1997). A judge may grant summary judgment on the issue of assumption of the risk if there are no facts in dispute and "if a person of normal intelligence, in the same position as the plaintiff, would clearly have comprehended the danger . . . ." *Crews*, 751 A.2d at 490. As with contributory negligence, however, the question of whether the plaintiff assumed the risk of harm is ordinarily reserved for a jury. *See Schroyer v. McNeal*, 592 A.2d 1119, 1123 (Md. 1991).

Defendants argue that plaintiffs agreed to retain the services of GCI and Gladstone despite the fact that plaintiffs knew subordination agreements had not been finalized and that waivers had not yet been executed. (ECF No. 65-1, p. 26). In support of their claims that plaintiffs assumed the risk of being exposed to potential legal liability and financial loss, defendants point primarily to Dell's deposition, in which he acknowledged that he was aware the subordination agreement had not been finalized when he agreed to retain GCI and Gladstone. (*See id.*, Ex. A, pp. 434–35). Plaintiffs, however, maintain that DeTar assured them on multiple

occasions that he would complete the relevant subordination agreements by April 29, 2013, a mere few days after DeTar directed plaintiffs to execute the consulting agreement with Gladstone and GCI. (ECF No. 7 ¶ 81). Furthermore, plaintiffs claim that throughout process leading up to the retention of Gladstone and GCI, DeTar assured Dell and PPAC that neither Gladstone nor GCI would take any action to advance their interests over those of other investors. (*See id.* ¶ 73). Plaintiffs emphasize that, given the long-term relationship they had with DeTar and M&S, they trusted DeTar "implicitly" to navigate them through the challenges resulting from Murphy's fraud. (*See id.*). Under the circumstances, while it may be the case that executing the consulting agreement with GCI without securing completed subordination agreements was imprudent, the undisputed facts do not establish that, *as a matter of law*, Dell and PPAC were contributorily negligent or that they assumed the risk of damage. Given that reasonable minds may differ as to whether Dell and PPAC voluntarily exposed themselves to a known hazard, the question is appropriately resolved by a jury. Moreover, defendants' motion does not address many of the other factual allegations in plaintiffs' complaint that are unrelated to DeTar's failure to obtain subordination agreements and may independently support a claim for legal malpractice. Accordingly, defendants' motion for summary judgment on Count I is denied.

### III. Count III: gross negligence

In addition to legal malpractice, plaintiffs also claim that DeTar's actions in failing to obtain executed waivers or subordination agreements from Gladstone, Gladstone's wife, GCI, or EPIX constitute gross negligence. (ECF No. 7 ¶¶ 13–32). Defendants maintain that the allegations in the complaint can only support a claim for ordinary negligence because "[t]here are no allegations of actual malice, intentional wrongful conduct or violation of an explicit, known right." (ECF No. 65-1, p. 34).

As the Maryland Court of Appeals has explained, gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper v. Rodriguez*, 118 A.3d 829, 845–46 (Md. 2015) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007). Maryland courts set a higher bar for pleading gross negligence, and "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist." *Id.* at 846. Whether a defendants' conduct amounts to gross negligence is a fact intensive inquiry, and is a question for a jury "unless the facts are so clear as to permit a conclusion as a matter of law . . . ." *Tarylor v. Harford Cnty. Dep't of Social Servs.*, 862 A.2d 1026, 1034 (Md. 2004). As a practical matter, the line between ordinary negligence and gross negligence can be difficult to determine, and "[a] legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." *Beall v. Holloway-Johnson*, 130 A.3d 406, 415 (Md. 2016) (internal citations omitted).

DeTar and M&S assert that plaintiffs fail to state a claim for gross negligence because they have not alleged the type of intent or malice required to establish that defendants' conduct exceeded ordinary negligence. (ECF No. 65-1, p. 34). Dell and PPAC, however, allege at multiple points in their complaint that DeTar's failure to secure waivers or subordination agreements from Gladstone, GCI, and related parties constituted reckless disregard of a known harm. (*See* ECF No. 7 ¶ 130). For example, plaintiffs claim that DeTar was familiar with Gladstone's litigious history, (*see id.* ¶ 78), and that DeTar manipulated the trust plaintiffs bestowed on him in order to maneuver Gladstone into a position from which he would have

access to private information that he could later use to his advantage, (*see id.* ¶ 87). In short, plaintiffs have alleged at least *some* conduct on the part of DeTar that a reasonable person may find to be intentional, wanton, and willful. Because plaintiffs have created a triable issue of fact as to whether DeTar's negligence was or was not gross, defendants' motion for judgment on the pleadings is denied as to Count III.

IV. **Counts II and IV: breach of fiduciary duty and vicarious liability**

Because I conclude that Maryland law applies to plaintiffs' claims, defendants' motion for judgment on the pleadings is granted as to Count II, breach of fiduciary duty, and Count IV, vicarious liability for M&S. As defendants point out, and plaintiffs concede, Maryland does not recognize a standalone claim for breach of fiduciary duty; rather, the breach of a fiduciary duty may support a cause of action for negligence or breach of contract. *See Int'l Bhd. of Teamsters v. Willis Corroon Corp.*, 802 A.2d 1050, 1060 n.1 (Md. 2002) ("although the breach of a fiduciary duty may give rise to one or more causes of action, in tort or contract, Maryland does not recognize a separate tort action for breach of fiduciary duty"). Plaintiffs' breach of fiduciary duty claim is based on the same allegations as their claim for legal malpractice, and is covered by the cause of action in Count I. Similarly, the parties agree that vicarious liability is not an independent cause of action under Maryland law. *See, e.g., DiFederico v. Marriott Int'l, Inc.*, 130 F. Supp. 3d 986, 990 (D. Md. 2015), *aff'd*, 2017 WL 444690 (4th Cir. Feb. 2, 2017) ("Vicarious liability is not a cause of action . . . [a]ccordingly, the entirety of the [complaint] . . . must be assessed on a theory of negligence"). Accordingly, defendants' motion for judgment on the pleadings is granted as to Counts II and IV. Plaintiffs request for leave to amend their complaint to assert a direct negligence claim against M&S is granted.

## CONCLUSION

For the foregoing reasons, defendants' motion for judgment on the pleadings is granted as to Counts II and IV, and denied as to Count III. Defendants' motion for summary judgment on Count I is denied. Lastly, plaintiffs are granted leave to amend their complaint to assert a direct negligence claim against M&S. A separate order follows.

8/8/2017
Date

/s/
J. Frederick Motz
United States District Judge

2017 AUG 31 AM 11: 39